**In re Petition of KPMG, INC., as Interim Receiver and Foreign Representative of Euro United Corporation, Debtor.**

No. 99–17139 K.

United States Bankruptcy Court,
W.D. New York.

June 27, 2002.

Steven C. Bennett, Jones, Day, Reavis & Pogue, New York City, Christopher R. Schueller, Buchanan Ingersoll Professional Corporation, Buffalo, NY, for KPMG as Interim Receiver.

Zdarsky, Sawicky & Agostinelli, Mark J. Schlant, Joseph E. Zdarsky, of counsel, Buffalo, NY, Unsecured "Class Representative" for Creditors of "Euro Delaware".

MICHAEL J. KAPLAN, Bankruptcy Judge.

This is a 11 U.S.C. § 304 proceeding, NOT a bankruptcy proceeding. An interesting question is presented regarding 11 U.S.C. § 304[1] as interpreted by the Second Circuit in *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341 (1992), which said: "Once a plausible challenge is presented as to whether particular property falls within the statutory definition ['of property involved in [a] foreign proceeding'], the bankruptcy court whose authority is invoked must determine the legitimacy of that invocation. The nature of this determination demands that it be made prior to the turnover of the property." *Id.* at 349.[2]

---

1. 11 U.S.C. § 304 provides: Cases ancillary to foreign proceedings
(a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.
(b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—
(1) enjoin the commencement or continuation of—
(A) any action against—
(i) a debtor with respect to property involved in such foreign proceeding; or
(ii) such property; or
(B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;
(2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or
(3) order other appropriate relief.
(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—
(1) just treatment of all holders of claims against or interests in such estate;
(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
(3) prevention of preferential or fraudulent dispositions of property of such estate;
(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
(5) comity; and
(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

2. The dispute in *Koreag* concerned the parties' respective interests in funds deposited in a New York bank account in connection with a series of currency exchange transactions. A creditor brought suit in U.S. District Court and obtained an ex parte order of attachment against the Swiss debtor's New York bank account. Ultimately, *Koreag* (the liquidator) petitioned the bankruptcy court for relief and sought an injunction against further attempts by the creditor to reach the funds in the account, and an order turning over the account to *Koreag* as liquidator pursuant to § 304(b)(2). The bankruptcy court declined

To set the stage for a presentation of the question, consider some simple propositions that are self-evident.

Firstly, if a court (any court) with jurisdiction over particular personalty is considering conflicting claims of ownership of that property and is doing so on notice to the various purported owners, there is nothing in U.S. law that requires notice to the *creditors* of those various purported owners. (Bulk sales laws, for example, do not apply.)

Secondly, if a purported owner defaults in that forum while insolvent, the creditors of that entity may not collaterally attack the result even in a subsequent bankruptcy of that purported owner. Rather, they must consider whether the failure of controlling persons to assert the claim was a breach of fiduciary duty to the creditors, for which those controlling persons might be personally liable.

Thirdly, not all *in rem* proceedings require service of a summons and complaint. Many judicial sales in general, and many bankruptcy sales in particular, convey good title if a possible owner has been given notice by mail or by publication, but defaults.

And lastly, if the court considering ownership is not a court in the United States, and if one "inserts" an international border between that court and the property in the United States to be sold, a § 304 proceeding may be necessary to aid the foreign court.

The question here presented is whether *creditors* of one purported owner who defaulted in the Canadian proceedings may now, pursuant to *Koreag*, actually litigate what *their debtor* failed to litigate in Canada when *it* had the opportunity to do so.

## DETAILS THAT ARE NOT COMMON IN § 304 PROCEEDINGS

Several case-specific refinements of the question may or may not change the answer that emerges to the general question above. The refinements are these:

1. Although the creditors raising the issue here are creditors of a corporation that failed to claim ownership in the proceedings in Canada, and would not ordinarily be required to be given notice of such proceedings, it appears that those creditors in fact were given notice of the proposed judicial sale and of the opportunity to appear and be heard in Toronto.

to make a threshold finding as to who owned the property, stating that it "placed the proverbial cart before the horse" to argue that the ownership of the property must be decided first, and it ordered turnover of the funds. *Id.* at 347. The creditor appealed and the District court affirmed, but stayed the enforcement of the order to allow the creditor to apply to the Court of Appeals for a further stay. The Court of Appeals agreed that turnover of the property was improper because the bankruptcy court improperly emphasized the factor of "comity" to the exclusion of other vital considerations. The Court of Appeals acknowledged that there were disparate views as to whether comity should be accorded superior weight, but went on to state: "Under any view of the relative weight to be

accorded the pertinent § 304(c) factors, turnover would be a permissible exercise of discretion as to those funds." The order of the district court was vacated and the matter was remanded for further proceedings. *Id.* at 358–359.

It is useful to note that *Koreag*, together with *In re Treco*, 240 F.3d 148 (2nd Cir.2001) manifest an important distinction between issues of ownership—"Is the property part of the foreign estate or is it property of another, U.S. claimant?"—and lien rights or priority rights appertaining to property owned by the foreign debtor, which was the focus of *Treco* and its emphasis on the fact that § 304 was intended to prevent piecemeal distribution of a "debtor's estate."

2. The corporation that defaulted ("Euro Delaware") is a Delaware-incorporated wholly-owned subsidiary of the Canadian debtor ("Euro Canada"). The Canadian proceeding was involuntary. The Receiver[3] of the assets of Euro Canada (the parent) claimed (and continues to claim) that the disputed assets were owned solely by the parent corporation.[4]

3. The persons who previously controlled both the Canadian parent and the U.S. subsidiary actually appeared and litigated in Canada, but did so on behalf of a different U.S. corporation ("Magnum") that now purports to be a creditor of Euro Delaware, but that argued *its own independent claims in Canada. not its claims "through"* Euro Delaware. Were Magnum the only creditor of Euro Delaware affected here, this Court would unhesitatingly relegate it to Canada to assert its rights "through" Euro Delaware, as the persons who controlled both Magnum and Euro Delaware perhaps should have done for the benefit of *all* Euro Delaware creditors when they previously appeared in Toronto.[5] But there are a number of other creditors of Euro Delaware here, including the State of New York Department of Taxation and Finance. It is the presence of other creditors that led this Court to appoint a "Class Representative" for all creditors of Euro Delaware.

4. Canadian law seems to permit certain relationships among parties, and some exercises of jurisdiction, that would not likely be permitted in the United States.

(A) The Canadian Court from the outset purported to exercise jurisdiction over all assets of affiliates of Euro Canada even though the affiliates themselves were not in any insolvency proceedings anywhere; it did so on the basis of some sort of *prima facie* showing that the parent was the true owner of any assets of affiliates. That would not happen here. In the U.S., in the absence of a prior adjudication that ownership of assets is in fact in the parent, all the affiliates would probably need to file or be filed under Title 11, and the issue of inter-company claims would be addressed at some point.

(B) The Canadian Receiver retained two law firms in Canada and two in the United States to advise it and act on its behalf, and it was permitted by the Canadian Court that one of the firms in Canada and one in the United States would also represent the secured creditor (G.E.C.C.) who initiated the Canadian proceedings and who will receive all of the proceeds of all of the assets if the Canadian orders are enforced by this Court. There is no suggestion that there were Chinese Walls set up within those two firms that represent both the Receiver and G.E.C.C. In the United States a bankruptcy trustee must employ "disinterested" counsel only, except as to "special counsel" who are retained for limited purposes as permitted by the Court;

---

**3.** More correctly, the term in Canada is "Interim Receiver."

**4.** This leads to a deeper level of refinement. The Receiver of the parent claims that it owed no duty to creditors of the subsidiary. But it is not clear that as Receiver of all of the stock in the subsidiary, no governance was obliged. There are allegations that the subsidiary was without Directors and that the Receiver perhaps should have elected some, to provide an actual contest in Toronto. Another assertion is that the Receiver has vacillated between claiming that all assets of the subsidiaries were owned by the parent, and claiming that all the assets are liened to the same creditor, regardless of ownership; the latter claim would, of course, be proper for the lienor to assert, but it seems beyond the scope of the mission of a Receiver of the assets of the parent only. (See Refinement # 4.)

**5.** They claim that they had resigned from control of Euro Delaware before appearing in Toronto on behalf of other interests. See *supra* note 4.

it seems that in the present case the "limited" representation of the Receiver by counsel who also represents G.E.C.C. was a matter of the Receiver's self-imposition, not defined by the Canadian Court.

(C) The Canadian Receiver (KPMG) is permitted in Canada to have an agreement directly with the petitioning creditor (G.E.C.C.) for indemnification. In the U.S., a creditor may indemnify "the estate," but may not separately indemnify a trustee for fees or expenses that the Court does not "allow" to the trustee or the trustee's counsel.

These various relationships are implicated in various assertions of impropriety on the part of KPMG. (See footnote 4.)

5. After KPMG obtained from this Court an Order "Prohibiting Creditor Action," it went to the Canadian Court and obtained "sale" orders that now turn out to be adjudications of ownership in favor of Euro Canada's secured creditor, G.E.C.C. This Court was never specifically told that adjudications of ownership were occurring in Canada, and in fact this Court repeatedly reassured United States creditors that ownership would be addressed here as to the sale proceeds. (Although this Court was regularly provided with the Canadian Orders, it was only recently argued that those Orders decided ownership "by implication." The Canadian Court has now agreed with that argument.)

Those are the major refinements.

## DISCUSSION

 As to the general question, this Court believes that *Koreag* certainly permits, but does not *require,* an *evidentiary* hearing. Rather, it is this writer's view that the independent determination required by *Koreag* may consist of a careful analysis of whether a previous ownership determination in the foreign proceeding should be granted recognition and enforcement in the United States. Further, it might instead consist of a "summary" fact-finding inquest not unlike those conducted when a Notice of Proposed Sale results in an Objection on the grounds that the Trustee is selling property that the debtor does not own.[6] Expeditiousness for the benefit of the estate in such instances sometimes requires a "contested matter" approach to the threshold question of whether the asserted adverse interest rises to the level entitled to Rule 7001, "Adversary Proceeding" protections to accord Due Process.

The Receiver (and, apparently, G.E.C.C., though G.E.C.C. has never formally appeared here in these proceedings) opposes a *de novo* determination of ownership, and prefers now to move to briefing and arguing why the prior rulings by the Canadian Court should be recognized and enforced.

This Court today rules, as a matter of the "discretion" that *Koreag* recognizes is vested in this Court, that the "refinements" enumerated above are a barrier here to the "recognize-and-enforce" approach to the *Koreag*-mandated determination. This is because it lacks common sense to opt against what this Court does regularly—determine ownership—in favor of a process that would require (1) discovery, in Canada, regarding the various interactions that would be prohibited here, such as the direct indemnification of KPMG by G.E.C.C. and the obtaining of advice and sharing of information between KPMG and those of its retained counsel who were also representing and advising G.E.C.C.; and (2) briefing and argument as to Canadian law on these subjects and on KPMG's fiduciary duties (if any) with

---

6. Often it is a landlord or an insider who raises such objection.

regard to governance of Euro Delaware; and (3) briefing and argument as to the requisites of comity, etc. under § 304. (Such things would be required because this Court will not rule or presume that U.S. creditors of Euro Delaware must accept complete loss without inquiry into these matters.)

However burdensome a *de novo* determination of ownership might seem, it is far preferable to the alternative in this case. (In another, simpler case, the "recognition and enforcement" inquiry that this Court believes the *Koreag* decision permits, would make sense.)

The Court will conduct a *de novo* determination of ownership of the proceeds of the sale of United States assets. The authority of the Class Representative is extended accordingly at the expense of those proceeds as will later be determined by the Court, and 11 U.S.C. § 330, 331 standards will be used.

The contested matter Rules are hereby invoked. A scheduling conference shall be conducted off-the-record by telephone among the Court, counsel for the Receiver, and the Class Representative on **Monday, July 8, 2002 at 9:00 a.m.**

*In the alternative, the Court invites a Chapter 7 filing by or against Euro Delaware, and a disinterested trustee will decide how to proceed.*

SO ORDERED.